1

2

3

4

5

6

7

8

9              IN THE UNITED STATES DISTRICT COURT

10                 FOR THE DISTRICT OF OREGON

11  GEORGE DONATHAN,                    )
                                        )
12                  Plaintiff,          )
                                        )    No.  CV-03-1705-HU
13          v.                          )
                                        )
14  JOANNE B. BARNHART,                 )
    Commissioner of Social             )
15  Security,                           )    FINDINGS & RECOMMENDATION
                                        )
16                  Defendant.          )
    ────────────────────────────────────)
17
    Tim Wilborn
18  WILBORN & ASSOCIATES, P.C.
    2020-C SW 8th Avenue, PMB #294
19  West Linn, Oregon 97068

20          Attorney for Plaintiff

21  Karin J. Immergut
    UNITED STATES ATTORNEY
22  District of Oregon
    Craig J. Casey
23  ASSISTANT UNITED STATES ATTORNEY
    1000 S.W. Third Avenue, Suite 600
24  Portland, Oregon 97204-2902

25  Jeffrey Baird
    SPECIAL ASSISTANT UNITED STATES ATTORNEY
26  Social Security Administration
    701 5th Avenue, Suite 2900 M/S 901
27  Seattle, Washington 98104-7075

28          Attorneys for Defendant


1 - FINDINGS & RECOMMENDATION

HUBEL, Magistrate Judge:

Plaintiff George Donathan brings this action for judicial review of the Commissioner's final decision to deny disability insurance benefits (DIB). This Court has jurisdiction under 42 U.S.C. §§ 405(g). I recommend that the Commissioner's decision be affirmed.

## PROCEDURAL BACKGROUND

Plaintiff applied for DIB on September 5, 2000, alleging an onset date of June 13, 2000. Tr. 62-64. His application was denied initially and on reconsideration. Tr. 50-51.

On September 4, 2002, plaintiff, represented by counsel, appeared for a hearing before an Administrative Law Judge (ALJ). Tr. 294-333. On June 2, 2003, the ALJ found plaintiff not disabled. Tr. 18-37. The Appeals Council denied plaintiff's request for review of the ALJ's decision. Tr. 6-9.

## FACTUAL BACKGROUND

Plaintiff alleges disability based on fibromyalgia and depression. Tr. 73, 311. At the time of the September 4, 2002 hearing, plaintiff was forty-nine years old. Tr. 62 (showing date of birth as September 12, 1953). He has a tenth grade education. Tr. 36. His past relevant work is as a custodian. Tr. 35.

I.  Medical Evidence

In October 1998, plaintiff was referred to Dr. Timothy Hill, M.D. for upper extremity pain, by his then primary treating physician Dr. Ole Hansen, M.D. Tr. 254. On October 5, 1998, plaintiff reported to Dr. Hill that he had a two- to three-year history of waxing and waning pain in the region, with it becoming severe in August 1998. Id. Plaintiff attributed the pain to

2 - FINDINGS & RECOMMENDATION

performing repetitive hand and wrist motions, as well as lifting activities. Id. He was taken off of work for three weeks and then given light duty for three weeks. Id. Plaintiff reported that the pain interfered with his sleep and that he awakened with tingling sensations in his hands. Id.

On physical examination, Dr. Hill found that plaintiff had diffuse tenderness throughout the upper trapezius and cervical paraspinal muscles. Id. He also found marked tenderness over the medial and lateral epicondyles, biceps and triceps musculature, and diffusely throughout the forearms and wrists. Tr. 254-55. Finkelstein's[1] and Phalen's[2] tests were negative. Tr. 255.

Dr. Hill diagnosed plaintiff as having bilateral upper extremity overuse. Id. He stated that while there was no specific pattern of tendinitis, he suspected there was a component of ongoing tendon irritation. Id. He further diagnosed plaintiff as suffering from a secondary sleep disturbance, which he thought contributed to some pain amplification. Id. He concluded that the

_____

[1] "Finkelstein's test" is used to detect the presence of deQuervain's tendinitis. The patient makes a fist with the thumb tucked inside of the other fingers. The examiner stabilizes the forearm with one hand and deviates the wrist to the ulnar side. Sharp pain in the area of the tendons is strong evidence of deQueravain's tendinitis or tenosynovitis. See Definition and Explanation at www.med.ufl.edu/rheum/finkel.html; www.fpnotebook.com/ORT69.htm; www.ortho-u.net/orthoo/136.htm.

[2] "Phalen's test" involves the patient flexing both wrists to 90 degrees with the dorsal aspects of the hands held in apposition for 60 seconds. Lawrence M. Tierney, Jr., M.D., Stephen J. McPhee, M.D., Maxine A. Papadakis, M.D., Current Medical Diagnosis & Treatment 2001 828 (40th ed. 2001). The test is considered positive when it produces pain or paresthesia in the distribution of the median nerve. Id.

3 - FINDINGS & RECOMMENDATION

injuries were related to plaintiff's work activities as a University of Oregon custodian. Id. He referred plaintiff to another session of physical therapy, to focus on long duration stretches, and recommended an aerobic program. Id. He started him on Paxil and Flexeril. Id. He continued him on the four hour per day work limit started by Dr. Hansen, for two additional weeks. Id.

On October 22, 1998, plaintiff reported to Dr. Hill that he felt no better, but that he had just begun with physical therapy the previous day. Tr. 253. He stated that while the Flexeril appeared to help him sleep, the Paxil made him "feel funny" so he stopped taking it. Id. He also explained to Dr. Hill that he was switching primary care physicians from Dr. Hansen to Dr. Dwayne Rice as Dr. Hansen had failed to timely submit some worker's compensation-related paperwork. Id.

On physical examination, Dr. Hill noted that plaintiff continued to present with diffuse tenderness throughout the upper traps, rhomboids, clavicle, biceps, triceps, epicondyles, and forearms. Id. He noted mild limitations of cervical range of motion. Id. He found shoulder flexion and abduction limited because of pain. Id.

He continued to diagnose plaintiff as suffering from bilateral upper extremity overuse, but he added that plaintiff's presentation was "somewhat unusual in that he has rather diffuse tenderness in a non-specific pattern." Id. He indicated that this raised the question of a fibromyalgia component. Id. He continued to note plaintiff's secondary sleep disturbance which likely contributed to some pain amplification. Id.

4 - FINDINGS & RECOMMENDATION

Dr. Hill increased the dose of Flexeril and started plaintiff on Prozac, both for pain and for possible fibromyalgia features. Id. He continued to limit plaintiff to four hours of work per day and no lifting in excess of ten pounds. Id.

On November 9, 1998, plaintiff again reported that he was not improved. Tr. 251. Dr. Hill noted that plaintiff's symptoms were somewhat vague, but involved the neck muscles, upper arms, and forearms. Id. He noted that plaintiff's electrodiagnostic testing to rule out carpal tunnel syndrome, which had been ordered by Dr. Rice, was normal. Id. He further noted that plaintiff was taking Aleve and had stopped taking the prescription medications as they had too many side effects. Id.

On physical examination, Dr. Hill again noted plaintiff's diffuse tenderness in a nonspecific pattern including over the biceps, triceps, and scapular spine. Tr. 251. He found full function and range of motion of the neck, shoulders, elbows, wrists, and fingers. Id. He had no specific pattern of numbness or weakness and his strength and sensation appeared to be full. Id.

Dr. Hill concluded that plaintiff still suffered from bilateral upper extremity overuse, but he noted that plaintiff's subjective complaints far outweighed any objective findings. Id. He released plaintiff to regular duty, eight hours per day, with the exception that buffing floors and "hosting" [sic?] carpets should be limited to a maximum of four hours per day. Id.

On November 24, 1998, plaintiff complained to Dr. Hill about aching in his neck, forearms, and upper arms. Tr. 249. He was continuing to take Aleve. Id. On physical examination, Dr. Hill

5 - FINDINGS & RECOMMENDATION

found diffuse tenderness throughout the arms in a nonspecific pattern. Id. Plaintiff had full range of motion in his shoulders, elbows, wrists, and cervical spine. Id. Dr. Hill continued to opine that plaintiff suffered bilateral upper extremity overuse, but at this visit, Dr. Hill added that plaintiff had borderline fibromyalgia. Id. He encouraged plaintiff to pursue a water aerobics program to help with the borderline fibromyalgia symptoms. Id. He also determined that a referral to the fibromyalgia clinic and Oregon Health & Sciences University (OHSU) was unwarranted as plaintiff did not meet all the diagnostic criteria for the disease. Id. He released plaintiff to work full time with no restrictions, but noted that plaintiff was likely at risk for some waxing and waning symptoms over the next few months as he returned to full-time work. Id.

During the time that plaintiff was seeing Dr. Hill, he established a relationship with his new treating physician Dr. Rice. Plaintiff saw Dr. Rice for the first time on October 26, 1998. Tr. 191. Dr. Rice noted that Dr. Hill was treating plaintiff for hand, elbow, and shoulder injuries, and as a result, Dr. Rice was limiting his examination to plaintiff's wrists. Id. He found full range of motion, but a positive Tinel's[3] on the right and a positive Phalen's bilaterally. Id. He ordered the electrodiagnostic studies which, as noted above, turned out to be normal. Id.

---

[3] "Tinel's test" or "Tinel's sign" is a "[c]utaneous tingling sensation produced by pressing on or tapping the nerve trunk which has been damaged or is regenerating follow[ing] trauma." Taber's Cyclopedic Medical Dictionary 1462 (14th ed. 1981).

6 - FINDINGS & RECOMMENDATION

He indicated that plaintiff's history and physical exam were compatible with carpal tunnel syndrome and that he would order plaintiff to use wrist splints, to use at night initially and progressing to twenty-four hours per day. Id. He also indicated that because Dr. Hill was treating plaintiff for the upper extremity problem, it did not make sense to involve multiple physicians and Dr. Hill should be considered the treating physician for these problems. Id.

Plaintiff next saw Dr. Rice after he concluded treating with Dr. Hill. At plaintiff's January 8, 1999 visit, Dr. Rice indicated familiarity with Dr. Hill's chart notes. Tr. 190. At that visit, plaintiff complained of fatigue and of diffuse migrating generalized pains, with or without activity. Id. He reported having lots of symptoms while working. Id. On physical examination, Dr. Rice noted diffuse tenderness in the neck, shoulder, and arms. Id. He indicated that plaintiff had fibromyalgia syndrome. Id. No diagnostic criteria were identified on the basis for this conclusion. He recommended water exercises and also started him on amitriptyline with a notation that the dose may need to increase. Id.

On January 21, 1999, plaintiff saw Dr. Rice for knee and calf pain and a concern about his ability to handle heavy cleaning equipment at work with his knee pain. Tr. 189. On examination, Dr. Rice found tenderness over the L-4, L-5 SIJ (presumably referring to the sacro-iliac joint) areas, sciatic notch areas, and posterior thigh. Id. He found no specific findings related to plaintiff's knee. Id. He assessed plaintiff as having pain syndrome and fibromyalgia. Id. He planned on making a referral to

7 - FINDINGS & RECOMMENDATION

the OHSU fibromyalgia clinic.  Id.

On April 1, 1999, plaintiff was seen by rheumatologist Dr. Paul Hudson, M.D., on referral from Dr. Rice.  Tr. 146.  Plaintiff reported a long history of musculoskeletal pain, myalgias, arthalgias, and fatigue that had been more troublesome over the past three years.  Id.  Dr. Hudson noted that plaintiff had been treated with multiple physical modalities including exercise, pool therapy, antidepressants, and anti-inflammatory drugs, all to no avail.  Id.  He also noted plaintiff's "fragmented sleep."  Id.

Dr. Hudson reported plaintiff's current medications as Aleve and Compose.  On physical exam, he found "multiple classic tender points identified in the shoulders, upper and lower back, hips, and elbows."  Id.  He concluded that plaintiff's physical examination supported a diagnosis of fibromyalgia syndrome.  Tr. 147.  However, there is no documentation of the diagnostic criteria found that supports this conclusion.

He recommended treatment with tricyclic antidepressant medication as a way to improve plaintiff's sleep quality and reduce his symptoms.  Id.  He prescribed imipramine and indicated that plaintiff was to follow up with Dr. Rice who, he surmised, may want to increase the dosage to achieve restful sleep without interruptions.  Id.  He suggested plaintiff switch to nortriptyline if he could not tolerate imipramine.  Id.

In May 1999, plaintiff saw Dr. Rice who increased the imipramine dose prescribed by Dr. Hudson.  Tr. 188.  Plaintiff told Dr. Rice that he did not want to do "extra exercise" because it hurts him.  Id.  Dr. Rice explained that most studies show that exercise, including stretching, is helpful.  Id.  Plaintiff

8 - FINDINGS & RECOMMENDATION

inquired about legal marijuana, reporting to Dr. Rice that he talked with someone with fibromyalgia who uses it. Id. Dr. Rice discussed the pros and cons with plaintiff and recommended more conventional therapies at this point "early in our course of treatment." Id.

In June 1999, plaintiff reported no change in his pain or broken sleep. Tr. 187. Dr. Rice increased the imipramine dosage again. Id. On July 7, 1999, plaintiff told Dr. Rice that while he has always been able to work, despite his pain, he had to leave work the night before and go home because of pain. Id. He indicated that he still had pain on his left side from his back into his leg and hip. Id. On physical exam, Dr. Rice noted SIJ tenderness and some generalized tenderness into the hip and groin. Id. He had fair range of motion of his back and hip, although with a certain degree of tenderness. Id. Dr. Rice continued to assess plaintiff as having fibromyalgia and recommended that he continue with heat, ibuprofen, and range of motion. Id. He noted that plaintiff had an August 11, 1999 appointment with the OHSU fibromyalgia clinic. Id.

Although there are no chart notes from plaintiff's assessment at OHSU, on August 25, 1999, Dr. Rice noted that plaintiff apparently reported he was seen at OHSU and had his fibromyalgia diagnosis confirmed. Tr. 186. He prescribed amitriptyline. Id.

Plaintiff did not see Dr. Rice again until May 26, 2000., an apparent nine-month gap in treatment. However, on May 19, 2000, he saw another physician in Dr. Rice's office for removal of sutures on his thumb related to a dog bite. Tr. 186. At that time, plaintiff sought a refill of Xanax, which he indicated he had taken

9 - FINDINGS & RECOMMENDATION

in the past under stressful situations. Id. He received enough of
the medication to "get him through the weekend," although he was
counseled that it was not appropriate for long-term treatment, only
acute stress. Id.

At the May 26, 2000 appointment with Dr. Rice, plaintiff
indicated that he was experiencing acute stress over the sale of a
house and on the job because others were not helping and he was
getting blamed. Id. Dr. Rice noted that plaintiff was not eating
and was experiencing very broken sleep. Id. Dr. Rice further
noted that plaintiff had been a very cooperative patient and that
he and plaintiff had tried several things as part of his treatment,
but that plaintiff was frustrated when at his last visit to OHSU,
they wrote a prescription for 10 milligrams of imipramine when he
was already taking 75. Id. Dr. Rice prescribed a low-dose of
Lorazepam, a drug indicated for short-term manifestations of
excessive anxiety. Id.

When Dr. Rice next saw plaintiff, on June 8, 2000, plaintiff
reported feeling better and sleeping better. Tr. 185. Plaintiff
reported that his aches and pains were more manageable now that he
was sleeping well. Id. Although he was still under a lot of
stress, he was looking forward to a vacation to England in late
July to visit his wife's family. Id. Dr. Rice assessed plaintiff
as having fibromyalgia, a sleep disorder, and a mild anxiety
disorder. Id. He prescribed thirty additional doses of the anti-
anxiety medication. Id.

On June 22, 2000, plaintiff reported to Dr. Rice that he had
quit his job because he had "finally had it at work[.]" Tr. 184.
Plaintiff showed no interest in returning to his current job. Id.

10 - FINDINGS & RECOMMENDATION

Dr. Rice noted that he "supportive[ly] listen[ed]" to plaintiff and wanted to see him in one week, at which time he would explore the possibility of secondary depression which he thought might need to be pharmacologically treated. Id.

On June 28, 2000, plaintiff reported that he was irritable and while sleeping "OK" at night, was unable to get much done because of his pain. Tr. 183. He complained of low energy and low libido. Id. Dr. Rice continued to assess plaintiff has suffering from fibromyalgia syndrome. Id. In the June 28, 2000 chart note, Dr. Rice noted that he did feel that there was anything more he could do to help plaintiff. Id. He also assessed plaintiff as suffering from anxiety, and indicated plaintiff should use Xanax on an as-needed basis. Id. He further indicated that plaintiff suffered from depression, for which he prescribed Celexa. Id.

On August 28, 2000, plaintiff indicated that he had vacationed in England with his wife. Id. He complained of continued body aches, numb fingers, poor sleep, and feeling tired. Id. He had been off of Xanax for one month, but reported feeling "goofy" and sedated on Celexa. Id. Dr. Rice continued with his prior fibromyalgia assessment and offered plaintiff another consultation with Dr. Hudson, the rheumatologist. Tr. 182. However, he noted that plaintiff, now lacking insurance coverage, wanted to wait on this. Id.

In December 2000, plaintiff was examined, at the request of Disability Determination Services (DDS), by psychologist Alison Prescott, Ph.D., and neurologist Dr. William Bernstein, M.D. Dr. Prescott met with plaintiff on December 2, 2000. At that time, plaintiff reported that he had tried different medications for

11 - FINDINGS & RECOMMENDATION

depression, but each one had undesirable side effects. _Id._ He reported that he experienced severe aches and pains in his hands, arms, hips, and shoulders, and rated the pain as an 8 on a scale of 1 to 10. Tr. 153. He told her that bending down and lifting and using tools was difficult, and that sitting for more than thirty minutes produced stiffness and achiness. _Id._ He also indicated that his fingers and toes sometimes went numb. _Id._ He was taking Aleve. _Id._

He noted that his fibromyalgia and leaving his job had increased his depression. He reported problems sleeping and being very irritable. _Id._ He related that he moved slowly in the morning, watched television for several hours each day, and glanced at the newspaper. _Id._ He explained that he and his wife raise Jack Russell terrier dogs and that he did chores associated with the dogs such as cleaning their pens, feeding them, and playing with them. _Id._ He could mow the lawn, but it took him two hours to do so because of all the rest breaks he has to take. _Id._ He is able to burn the trash and perform some handyman chores. _Id._

His exercise consisted of walking to and from his mailbox each day, a distance of several hundred yards. Tr. 154. He drives once per week to do short errands or go to appointments and he and his wife go out to dinner about once per month. _Id._

Plaintiff received a score of 25 on the Beck Depression Inventory administered by Dr. Prescott, indicating moderate depression. _Id._ Plaintiff's responses to the test indicated a loss of pleasure, suicidal ideation, agitation, loss of interest, loss of energy, sleep disruption, irritability, decreased appetite, and fatigue. _Id._

12 - FINDINGS & RECOMMENDATION

Based on her interview and examination, the Beck Depression Inventory, and other tests designed to test concentration and short-term memory, Dr. Prescott diagnosed plaintiff as suffering from a dysthymic disorder. Tr. 155. She further assessed his Global Assessment of Functioning (GAF) score as 60. Id.

Plaintiff was then examined by Dr. Bernstein on December 4, 2000. He reported to Dr. Bernstein that he experienced pain all over with significant pain in his chest, legs, and arms. Tr. 157. He stated that the pain was severe upon waking in the morning, getting worse as the day went on, and worse with activity. Id. Dr. Bernstein noted plaintiff's "fatiguability" and poor sleeping pattern. Id. He reported that he had trouble walking more than one-half of a block and could not lift more than five or ten pounds. Id.

On physical exam, Dr. Bernstein reported that plaintiff rated almost all of the fibromyalgic points as "annoying," meaning not terribly tender, but not terribly comfortable. Tr. 158. He reported that he was "quite tender" in the second costochondral junction and lateral epicondyles. Id. Dr. Bernstein also noted, however, that plaintiff was tender at multiple other control areas[4], including the gastrocnemei, as well as the midshafts of the humerus. Id. There were joints reported as tender or with problems. Id. Dr. Bernstein further observed that plaintiff's ambulation was somewhat antalgic and that though he did use a cane, he could walk reasonably easily without it. Id.

---

[4] Dr. Bernstein's chart notes provide no information about what he means by "control areas" or the significance of his finding pain in those areas.

13 - FINDINGS & RECOMMENDATION

Dr. Bernstein diagnosed plaintiff as suffering from fibromyalgia with sleep disturbance. Tr. 159. He reported that he could not find any evidence or organic neurological disease necessitating plaintiff's use of a cane. Id.

In January 2001, a non-examining DDS internal medicine physician reviewed plaintiff's records and assessed plaintiff's residual functional capacity. Tr. 214. The physician opined that plaintiff could occasionally lift twenty pounds, could frequently lift ten pounds, could stand or walk six hours in an eight-hour day, and could sit six hours in an eight-hour day. Id. Overall, the physician concluded that plaintiff's symptoms were attributable to a medically determinable impairment, but the severity or duration of symptoms was disproportionate to what was expected from this impairment. Tr. 216.

Plaintiff saw Dr. Rice again in February, March, and April 2001. Tr. 180-81. Although his major complaint was epigastric tenderness, resulting in a diagnosis of gastritis, Dr. Rice did note in February that plaintiff's fibromyalgia was unchanged, and in April that plaintiff had tenderness along the upper anterior chest near the sternum, over the posterior neck, trapezius muscles, wrists, medial and lateral epicondyles on the elbows, lateral medial tenderness on the knees and ankles, and tenderness over the SIJ areas. Id. At the April visit, Dr. Rice began another prescription of nortriptyline. Tr. 180.

In June 2001, a non-examining DDS psychologist reviewed plaintiff's records and completed a Psychiatric Review Technique Form. Tr. 194-204. The psychologist determined that plaintiff had

dysthymia.[5]  Tr. 197.  Nonetheless, the psychologist found that plaintiff had only mild limitations in his activities of daily living, in his ability to maintain social functioning, and in his ability to maintain concentration, persistence, or pace.  Tr. 204.

On September 12, 2001, Dr. Hudson, the rheumatologist, examined plaintiff again at Dr. Rice's request.  Tr. 259.  He noted that plaintiff continued to struggle with fibromyalgia.  Id.  He remarked that plaintiff had stopped working and that he was running a kennel on his property.  Id.  Plaintiff reported "a stable pattern of fatigue and musculoskeletal pain."  Id.  Dr. Hudson stated that plaintiff had tried medications and had not responded.  Id.  His current medications included Celexa, Zantac, nortriptyline, and Neurontin.  Id.  Plaintiff complained that his current "program" killed his libido, but that he did not know which drug was responsible.  Id.  Plaintiff reported he was only "capable of working a few hours daily, even when he works on his own place at his own pace."  Id.

On physical examination, Dr. Hudson found multiple tender points, but there is no mention of which ones or how many.  Id.  He found no joint symptoms.  Id.  He continued to assess plaintiff as having fibromyalgia, "stable and unresponsive to medication."  Id.  He noted that it was "not reasonable to think that this man can hold  any kind of regular job with this illness."  Id.  He further remarked that plaintiff "might yet respond to a different

---

    [5] Dysthymic disorder is where depressive manifestations occur at a subthreshold level.  Mark H. Beers, M.D. & Robert Berkow, M.D., The Merck Manual of Diagnosis & Therapy 1538 (17th ed. 1999).

15 - FINDINGS & RECOMMENDATION

medication program, but there is little that he has not tried." Id. Dr. Hudson recommended that plaintiff stop taking Celexa, which he thought was likely responsible for his loss of libido, but to continue taking his other medications and increasing his dose of Neurontin. Id. He indicated that plaintiff would return to Dr. Rice's care. Id.

On September 26, 2001, Dr. Rice wrote a letter regarding plaintiff's status. Tr. 219. He stated that he had treated plaintiff for the last three years. Id. He further stated as follows:

> [Plaintiff] has developed fibromyalgia and is totally disabled from this. This is expected to be a permanent condition. He has tried multiple medications and therapeutic regimens without success. He has been evaluated at Oregon Health Science Center fibromyalgia clinic and also by Dr. Paul Hudson, rheumatologist, here locally in Eugene. At this point, I anticipate no improvement in either patient's symptoms or his functional ability.

Id.

On November 12, 2001, Dr. Rice completed a "Fibromyalgia Impairment Questionnaire" regarding plaintiff's limitations. Tr. 220-25. There, Dr. Rice checked a box indicating that plaintiff met the American Rheumatological criteria for fibromyalgia. Tr. 220. He noted that plaintiff's prognosis was very poor for improvement. Id. He listed the following locations of tenderness as the positive clinical findings in support of his diagnosis: trapezius, right and left elbow, right and left SIJ, right and left knee, and right and left ankle. Id. This totals Nine tender points. He noted that plaintiff also had a work-up by a rheumatologist. Tr. 221. He noted that plaintiff's primary symptoms were chronic fatigue, chronic pain, and a chronic sleep

16 - FINDINGS & RECOMMENDATION

disorder.  Id.  He rated plaintiff's pain as a 7 or 8 on a 1-10 scale.  Tr. 222.

Dr. Rice listed five separate medications that plaintiff had taken and indicated that none had been helpful.  Id.  He noted that he had substituted medications in an attempt to produce less symptomatology or to relieve side effects.  Id.  He expected plaintiff's symptoms to last at least twelve months.  Id.  He reported that plaintiff was not a malingerer.  Id.

In an eight-hour day, Dr. Rice opined that plaintiff could sit for one to two hours and could stand or walk for one to two hours.  Tr. 223.  He believed it would be necessary or medically recommended that plaintiff not sit continuously in a work setting.  Id.  He opined that plaintiff would need to get up and move around every fifteen to thirty minutes and would be unable to resume sitting for five minutes.  Id.  He also believed it would be necessary or medically recommended that plaintiff not continuously stand or walk in a work setting.  Id.

He assessed plaintiff as capable of lifting and carrying up to ten pounds occasionally.  Id.  He felt plaintiff was capable of jobs with low to moderate stress.  Id.  He did not believe that emotional factors, such as depression or anxiety, contributed to the severity of plaintiff's symptoms and functional limitations.  Tr. 224.  Although he did not believe that plaintiff could work an eight-hour day, if he did so, he stated that plaintiff would have to take unscheduled breaks every forty-five to sixty minutes and would need to rest ten to twenty minutes before resuming work.  Id.

He noted that plaintiff's impairments were likely to produce good days and bad days and that on average, plaintiff would be

17 - FINDINGS & RECOMMENDATION

absent from work as a result of his impairments more than three days per month. Id. Finally, he indicated that plaintiff would need the following limitations:  no pushing, no pulling, no kneeling, no bending, no stooping, and no heights. Tr. 224-25. He concluded that the earliest date that the symptoms and limitations described in the questionnaire applied was August 2000.  Tr. 225.

On March 31, 2002, Dr. Hudson wrote a letter regarding plaintiff's limitations. Tr. 226-27. He recited that he initially evaluated plaintiff on April 1, 1999, at Dr. Rice's request, and that plaintiff reported at least a three-year history of chronic musculoskeletal pain, fatigue, and a lack of response to anti-inflammatory therapy.  Tr. 226. He noted plaintiff's history of fragmented and non-restorative sleep. Id. He stated that at the time, plaintiff's "physical exam demonstrated a classic pattern of tender points characteristic of fibromyalgia syndrome." Id.  He noted that he confirmed the diagnosis of fibromyalgia syndrome and recommended a trial of tricyclic therapy with imipramine.  Id.

He then recited that his next meeting with plaintiff was on September 12, 2001, when he returned for a follow-up evaluation and reported a failure of medical therapy on imipramine, nortriptyline, Celexa, and Neurontin.  Id. He noted that at that visit, it seemed that plaintiff was able to function a few hours per day while working at his own pace.  Id.

Dr. Hudson then stated:

I believe this gentleman continues to be limited by his chronic fatigue and musculoskeletal pain.  He is able to function a maximum of three or four hours daily, provided he can do so with his own timing.  He is clearly unable to work eight hours daily, five days per week.  According to his history, his function level has been compromised since the middle of 2000, and I see no reason to question

18 - FINDINGS & RECOMMENDATION

that history.

> Based on the duration of his history, and the failure of multiple medical treatments, I do not feel it is reasonable to expect any recovery in the foreseeable future.

Tr. 227.

On March 31, 2002, Dr. Hudson also completed a "multiple impairments questionnaire." Tr. 228-35. He recited that plaintiff's diagnosis was fibromyalgia syndrome and that his prognosis was poor because fibromyalgia is a chronic disease of long duration and plaintiff's lack of response to medication is a poor prognostic sign. Tr. 228. As positive clinical findings in support of his diagnosis, he listed plaintiff's classic history of pain, failure of medications, disrupted sleep, and multiple tender points in a classic distribution. Id. He stated that plaintiff's primary symptoms were fatigue and diffuse musculoskeletal pain in the back, shoulders, and neck. Tr. 229. He stated that plaintiff's symptoms and functional limitations were reasonably consistent with his physical impairment. Id.

In further describing plaintiff's pain, he indicated that it was widespread muscular and skeletal pain, aching in nature, and that it occurred primarily in the spine and proximal extremities. Id. Dr. Hudson noted that the pain occurred daily and that precipitating factors included activity, cold, and stress. Tr. 230. He rated plaintiff's pain as a 6 on a scale of 1-10 and his fatigue as an 8 on a scale of 1-10. Id. He stated that he had been unable to completely relieve the pain with medication without unacceptable side effects. Id.

In an eight-hour day, Dr. Hudson opined that plaintiff could

19 - FINDINGS & RECOMMENDATION

sit for three hours and could stand or walk for one hour.  Id.  He opined that plaintiff would need to get up and move around every thirty minutes and could resume sitting after ten minutes.  Tr. 230-31.  He believed that plaintiff could occasionally lift and carry up to twenty pounds and could frequently lift up to five pounds.  Tr. 231.  He explained that because repetitive activity produced more pain, plaintiff had significant limitations in doing repetitive reaching, handling, fingering, or lifting.  Id.

Dr. Hudson noted that plaintiff had tried imipramine, nortriptyline, and Neurontin without a positive response, and that no other treatment was available.  Tr. 232.  While he found plaintiff able to handle moderate stress, he opined that plaintiff's symptoms would likely increase if he were placed in a competitive work environment.  Id.  He found that plaintiff's pain and fatigue would frequently interfere with plaintiff's attention and concentration.  Tr. 233.

Dr. Hudson stated that plaintiff's impairments are ongoing and that he would expect them to last at least twelve months.  Id.  In contrast to Dr. Rice, he further stated that depression, related to the loss of personal productivity, contributed to the severity of plaintiff's symptoms and functional limitations.  Id.

Dr. Hudson recited that plaintiff would need to take four to six unscheduled breaks to rest at unpredictable intervals during an eight-hour work day, and would be able to return after fifteen to twenty minutes of rest.  Id.  He expected plaintiff's impairments to produce good days and bad days and that on average, plaintiff would miss more than three days of work per month as a result of his impairment.  Tr. 234.  He also found that plaintiff had the

20 - FINDINGS & RECOMMENDATION

following limitations:  no pushing, no pulling, no kneeling, no bending, no stooping, need to avoid temperature extremes, and need to avoid heights.  Id.

Plaintiff had an intake appointment for counseling at Options Counseling Services of Oregon, Inc., on January 8, 2002, and began therapy there with Todd Dennis, LCSW, on March 15, 2002.  Tr. 280-87.  According to an August 23, 2002 letter from Dennis, plaintiff sought counseling for assistance with issues of depression, anxiety, and chronic pain.  Tr. 248.  He was diagnosed with major depressive disorder, chronic.  Id.  Dennis stated that the source of the depression, in Dennis's opinion, was the difficulty plaintiff had in managing his chronic pain.  Tr. 248.  He opined that plaintiff was not employable at that time and that it was possible he may never be employable due to his combination of medical and mental health issues.  Id.

Dennis's chart notes indicate that he met with plaintiff weekly from March 15, 2002, to August 23, 2002.  Tr. 265-80.  They primarily discussed ways to reduce plaintiff's stress.  Id.  One of the activities they identified that plaintiff enjoyed was fishing, which he did a few times during the therapy.  Tr. 271, 273, 276. On one such occasion, plaintiff brought three geese home from the pond were he was fishing that day.  Id.  Plaintiff also reported overdoing it while putting in new floor tile while he wife was traveling in Switzerland.  Tr. 278, 279.  By the end of the five-month counseling period, plaintiff was having better success at managing stress at home.  Tr. 265.  He reported improved sleep in July 2002, due to decreased conflicts with his wife.  Tr. 270. Although Dennis indicates in his August 23, 2002 chart note that he

would see plaintiff again in two weeks, there are no additional notes in the administrative record.

Dr. Sandra B. Kalnins, D.O., a psychiatrist, wrote a letter on July 23, 2002, regarding plaintiff's disability. Tr. 237. Although the letter suggests that she saw plaintiff on March 18, 2002 for a disability evaluation, no records of that evaluation are in the administrative record.

In her July 23, 2002 letter, she stated that plaintiff reported a history of depression all of his life. Id. A variety of treatment measures had failed to provide improvement and had instead caused complications. Id. No medications had been helpful. Id. She concluded that plaintiff was permanently medically and psychiatrically disabled. Id.

On August 29, 2002, Dr. Kalnins completed a questionnaire regarding plaintiff's impairment and function. Tr. 240-47. There, she diagnosed plaintiff as suffering from fibromyalgia and depression, not otherwise specified. Tr. 240. She opined that plaintiff's depression symptoms would wax and wane and would impact his primary illness of fibromyalgia. Id. She was also under the impression that he required a cane or scooter for walking. Tr. 245. The basis for this impression beyond his use of the cane is unknown.

She cited the following clinical findings in support of her diagnosis: poor memory, sleep disturbance, personality change, mood disturbance, pervasive loss of interests, psychomotor retardation, feelings of guilt/worthlessness, difficulty thinking or concentrating, social withdrawal or isolation, decreased energy, and irritability. Tr. 241. She noted, however, that she performed

22 - FINDINGS & RECOMMENDATION

no diagnostic tests.  Id.

Dr. Kalnins listed plaintiff's primary symptoms as low energy, poor memory, generalized pain, periods of depression, and anxiety. Tr. 242.  She noted that plaintiff's symptoms were reasonably consistent with his physical and emotional impairments.  Id.  She found him markedly limited in the following abilities:  (1) to understand and remember detailed instructions; (2) to carry out detailed instructions; (3) to maintain attention and concentration for extended periods; (4) to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance; (5) to work in coordination with or proximity to others without being distracted by them; (6) to complete a normal workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and  (7) to respond appropriately to changes in the work setting.  Tr. 243-44.

Dr. Kalnins stated that plaintiff was not a malingerer.  Tr. 246.  She stated that plaintiff's condition was capable of producing good days and bad days, that he would likely be absent from work as  result of his impairments more than three times each month, and that his fibromyalgia limits his function on a daily basis and precludes him from employment.  Tr. 247.

II.  Plaintiff's Testimony

The ALJ began questioning plaintiff early in the hearing regarding his last visit to Dr. Hudson.  Tr. 297-99.  Plaintiff indicated that the last time he saw Dr. Hudson was back in 1997 or 1998.  Tr. 297.  The ALJ asked plaintiff if he were sure of that date.  Id.  Plaintiff responded that he was not sure, but that he

23 - FINDINGS & RECOMMENDATION

did remember some things about that time period. Id. He explained that he remembered he was switching doctors because "he" wasn't "doing" plaintiff's forms in a timely manner and that was in 1998 or 1997. Tr. 298. He also testified that he had seen Dr. Hudson between five to ten times. Tr. 300. The ALJ and plaintiff's counsel noted that plaintiff's testimony was not consistent with some of the records. Tr. 298. The ALJ asked that plaintiff or his attorney find out the date of plaintiff's last visit with Dr. Hudson and submit all progress notes. Id.[6]

Plaintiff testified that he quit work because of stress. Tr. 304-05. Although he did not quit because of his impairment(s), but apparently because of problems with his supervisor and co-workers, tr. 184, he stated that after he quit his job, he could no longer work because of depression and fibromyalgia. Tr. 311. He noted that he had tried exercising, but it caused more pain and became unbearable to continue. Tr. 313. At the time of the hearing, he tried to walk everyday for exercise. Id. Daily, he walked to his mailbox and back, and walked that same distance to retrieve the paper. Tr. 314. He estimated that each round trip was about 100 to 150 feet. Id. Sometimes he uses a cane. Tr. 315. He explained that he started using the cane in 1997 or 1998 on occasions when his hips or legs were hurting more than usual. Tr. 316.

_____

[6] In response to the ALJ's questions regarding Dr. Hudson, it is clear that plaintiff was confusing Dr. Hudson, the rheumatology specialist he saw on two occasions, with Dr. Hansen, his primary care physician he saw apparently several times before switching to Dr. Rice in the fall of 1998 because of Dr. Hansen's failure to timely submit plaintiff's worker's compensation forms.

24 - FINDINGS & RECOMMENDATION

Plaintiff estimated that his pain level was a 6 to 8 on a scale of 1-10. Tr. 316. He described being in constant pain in the areas of his hips, knees, feet, ankles, hands, wrists, arms, neck, shoulders, and upper and lower back. Id. His hip and leg pain prevents him from standing much longer than about fifteen minutes at a time. Tr. 316-17. He indicated that he could sit for five to ten minutes and then needs to stand before he can sit back down. Tr. 317. Although he can carry a gallon of milk, arm and hand pain prevents him from lifting a twenty pound bag of groceries. Id.

He assists his wife with her hobby of raising Jack Russell terriers. Tr. 309. He indicated that he helps by feeding the dogs and bringing them into the house. Id. The dogs weigh about ten to fifteen pounds and plaintiff stated that he cannot lift them because his arms start to hurt. Tr. 320.

On a typical day, plaintiff gets up and gets the paper and takes one of the dogs out to the pen. Id. He and his wife allow one dog at a time in the house on a rotating basis. Id. His wife leaves for work. Tr. 321. He sometimes takes out the trash if it is a small can. Id. He checks his email and feeds his two pet geese and his cats. Id. He spends no more than thirty minutes per week on the computer. Id.

He tries to help with housework by sweeping the floor once per week and puts dishes in the dishwasher. Tr. 322. He also may make a bed. Id. He has enjoyed fishing and though he testified that he went a few times per week, he also testified that he had not been out for several months. Id. He generally does stock pond trout fishing. Id. He drives two times per week. Tr. 302.

25 - FINDINGS & RECOMMENDATION

Plaintiff explained that his fibromyalgia symptoms have gotten worse over time.  Tr. 328.  At home, plaintiff lies down with his feet propped up to relieve his pain.  Tr. 331.  While this does not eliminate the pain, it relieves some of it.  Id.

## THE ALJ'S DECISION

The ALJ found that plaintiff had not engaged in any substantial gainful activity since his alleged onset date.  Tr. 22, 36.  The ALJ then found that plaintiff had a history of fibromyalgia and that for the purposes of this adjudication, it was a severe impairment.  Tr. 22-23, 36. While finding the impairment to be severe, he concluded it did not meet or equal any listed impairments.  Tr. 24, 36.  The ALJ concluded that the evidence failed to establish the existence of a severe mental impairment. Tr. 23-24.

The ALJ then determined that plaintiff retained the residual functional capacity (RFC) to perform a full range of light work, including the capacity to occasionally lift/carry twenty pounds and frequently lift/carry ten pounds, to walk/stand for at least six hours per day, and engage in at least occasional activities involving postural manipulation.  Tr. 25.  The ALJ stated that support for his assessment of plaintiff's RFC was based on the objective medical evidence and from an evaluation of the subjective allegations of record.  Id.

First, the ALJ discussed the objective evidence provided by Dr. Hill, Dr. Rice, Dr. Hudson, Dr. Prescott, Dr. Bernstein, Dr. Kalnins, and the Options Counseling Service.  Relevant details of the ALJ's decision are noted below, in the discussion.  However, in summary, the ALJ found a variety of reasons to reject various

26 - FINDINGS & RECOMMENDATION

aspects of their diagnoses and opinions. Tr. 25-33.

Next, the ALJ considered plaintiff's testimony and documentary statements regarding his symptoms and limitations. Tr. 33-35. He concluded that plaintiff's assertions were not credibly supported by the weight of the evidence. Id.

The ALJ then concluded that plaintiff could not return to his past relevant work as a custodian because it required a medium level of exertion. Tr. 35. However, applying the "grids," he concluded that given that plaintiff was a "younger individual," with a "limited education," and with the ability to perform the full range of light work, he was not disabled. Tr. 35, 36.

STANDARD OF REVIEW & SEQUENTIAL EVALUATION

A claimant is disabled if unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A).

Disability claims are evaluated according to a five-step procedure. Baxter v. Sullivan, 923 F.2d 1391, 1395 (9th Cir. 1991). The claimant bears the burden of proving disability. Swenson v. Sullivan, 876 F.2d 683, 687 (9th Cir. 1989). First, the Commissioner determines whether a claimant is engaged in "substantial gainful activity." If so, the claimant is not disabled. Bowen v. Yuckert, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520(b), 416.920(b). In step two, the Commissioner determines whether the claimant has a "medically severe impairment or combination of impairments." Yuckert, 482 U.S. at 140-41; see 20 C.F.R. §§ 404.1520(c), 416.920(c). If not, the claimant is not

27 - FINDINGS & RECOMMENDATION

disabled.

In step three, the Commissioner determines whether the impairment meets or equals "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." Yuckert, 482 U.S. at 141; see 20 C.F.R. §§ 404.1520(d), 416.920(d). If so, the claimant is conclusively presumed disabled; if not, the Commissioner proceeds to step four. Yuckert, 482 U.S. at 141.

In step four the Commissioner determines whether the claimant can still perform "past relevant work." 20 C.F.R. §§ 404.1520(e), 416.920(e). If the claimant can, he is not disabled. If he cannot perform past relevant work, the burden shifts to the Commissioner. In step five, the Commissioner must establish that the claimant can perform other work. Yuckert, 482 U.S. at 141-42; see 20 C.F.R. §§ 404.1520(e) & (f), 416.920(e) & (f). If the Commissioner meets its burden and proves that the claimant is able to perform other work which exists in the national economy, he is not disabled. 20 C.F.R. §§ 404.1566, 416.966.

The court may set aside the Commissioner's denial of benefits only when the Commissioner's findings are based on legal error or are not supported by substantial evidence in the record as a whole. Baxter, 923 F.2d at 1394. Substantial evidence means "more than a mere scintilla" but "less than a preponderance." Id. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Id.

DISCUSSION

Plaintiff contends that the ALJ made numerous errors. Plaintiff's arguments can generally be sorted into three

28 - FINDINGS & RECOMMENDATION

categories: (1) the rejection of plaintiff's subjective testimony; (2) the rejection of the opinions of plaintiff's treating physician and his treating/examining rheumatologist; and (3) the finding that plaintiff suffers from no severe mental impairment. Although some of the ALJ's findings may be erroneous, there are still bases for his decision that are supported by substantial evidence in the record. Thus, I recommend that the ALJ's decision be affirmed.

I. Plaintiff's Credibility

The ALJ found plaintiff's subjective testimony not credible and thus rejected his testimony regarding his pain and limitations. Additionally, since plaintiff's primary diagnosis is fibromyalgia which is based entirely on a patient's subjective reports of pain, the ALJ's finding regarding plaintiff's credibility tainted Dr. Rice's and Dr. Hudson's opinions, causing the ALJ to reject these opinions.

A. Standards

The ALJ is responsible for determining a claimant's credibility. Edlund v. Massanari, 253 F.3d 1152, 1156 (9th Cir. 2001). Any rejection of the claimant's subjective testimony must be supported by specific findings. Connett v. Barnhart, 340 F.3d 871, 873 (9th Cir. 2003); Dodrill v. Shalala, 12 F.3d 915, 917 (9th Cir. 1993). Unless there is affirmative evidence showing that the claimant is malingering, the Commissioner's reasons for rejecting the claimant's testimony must be "clear and convincing." Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998).

Among the factors that the ALJ may consider when determining the credibility of a claimant's complaints of pain are the claimant's daily activities, inconsistencies in testimony,

29 - FINDINGS & RECOMMENDATION

effectiveness or adverse side effects of any pain medication, and relevant character evidence. Orteza v. Shalala, 50 F.3d 748, 750 (9th Cir. 1995); see also Batson v. Commissioner, 359 F.3d 1190, 1196-97 (9th Cir. 2004) (affirming ALJ's negative credibility determination when claimant's testimony was not supported by objective medical evidence or persuasive medical doctor reports and was contradicted by claimant's own testimony regarding his activities of daily living). The ALJ may also consider unexplained, or inadequately explained, failure to follow a prescribed course of treatment. Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989).

    B.  Discussion

    The ALJ supported his negative credibility determination by noting inconsistencies with plaintiff's claimed limitations and his activities of daily living, his failure in his efforts to comply with his physicians' recommendations regarding exercise and medication, inconsistencies in his testimony, and relevant character evidence.

    As to his activities of daily living, the ALJ concluded that plaintiff's functional limitation testimony was not credible because it was inconsistent with plaintiff's significant activities such as fishing on a regular basis, home repair projects, and caring for 13 dogs, 10 cats, and geese. Tr. 34. While the ability to perform some household chores is not necessarily incompatible with an application for DIB, Ratto, 839 F. Supp. at 1428, plaintiff's admitted activities of feeding, playing with, and cleaning pens of thirteen dogs, feeding other pets, as well as fishing up to a few times per week, bringing three geese home on

30 - FINDINGS & RECOMMENDATION

one fishing trip, laying new floor tile, and doing other home repairs, undermine his testimony that he experiences constant pain at a level of 8 out of 10, that he cannot stand for more than fifteen minutes at a time, and that he cannot sit for more than five to ten minutes at a time. Substantial evidence in the record supports the ALJ's determination that plaintiff's subjective pain and limitations testimony is inconsistent with his activities of daily living.

The ALJ also noted that plaintiff's testimony was unreliable because the record failed to show that plaintiff had made any "serious effort to comply with [Dr. Rice's] repeated recommendations for exercise or medication trials." Tr. 34. The record supports the ALJ's determination. While there are some vague references to plaintiff's having tried water exercise, Tr. 146 (Dr. Hudson chart note showing that plaintiff had tried pool therapy but no indication of when, duration, frequency, etc.), Tr. 189 (Dr. Rice chart note referring to "continue with swimming"), there is no evidence that plaintiff regularly participated in any exercise program for a time long enough to assess its effectiveness.

Moreover, while plaintiff apparently tried several prescribed medications, the record shows that he repeatedly reported allegedly intolerable side effects shortly after starting the medication. For example, Dr. Hill prescribed Paxil and Flexeril on October 5, 1998. Approximately two weeks later, plaintiff reported that he had already stopped taking the Paxil because it made him feel "funny." On October 22, 1998, Dr. Hill substituted Prozac for the Paxil. But, just over two weeks after that, plaintiff reported

31 - FINDINGS & RECOMMENDATION

that he had stopped taking all prescription medications because of "too many side effects." Plaintiff's alleged intolerance of unspecified and vaguely-described side effects is inconsistent with testimony that he is in "8 out of 10" pain.

Next, the ALJ discounted plaintiff's testimony of severe pain because while plaintiff testified that he experiences fibromyalgia pain in his "'hips, knees, feet, ankles, hands, arm, neck, shoulders, and entire back,' treating and evaluating medical sources of record have noted that his complaints have been atypical of classical fibromyalgia symptomatology on occasion." Tr. 34. When Dr. Hill first noted that plaintiff's symptoms raised a possible question of fibromyalgia, he remarked that plaintiff's presentation was "somewhat unusual in that he has rather diffuse tenderness in a non-specific pattern." Tr. 253. Later, he remarked that plaintiff's symptoms were somewhat vague, and again noted that plaintiff presented with "diffuse tenderness in a nonspecific pattern." Tr. 251. He remarked that plaintiff's subjective complaints far outweighed any objective findings. Id.

In late November 1998, Dr. Hill continued to note "diffuse tenderness throughout the arms in a nonspecific pattern." Tr. 249. While he added "borderline fibromyalgia" to plaintiff's diagnosis of bilateral upper extremity overuse, the record reflects that plaintiff, not Dr. Hill, initiated a conversation about the OHSU fibromyalgia clinic, and that Dr. Hill responded the referral would be unnecessary as plaintiff did not meet the diagnostic criteria for fibromyalgia. Id.

Additionally, Dr. Bernstein, the examining neurologist, reported that plaintiff rated almost all of the fibromyalgic points

32 - FINDINGS & RECOMMENDATION

as "annoying," which he noted meant not quite terribly tender, but not terribly comfortable either. This is less than the required pain threshold required by the American Rheumatological Association criteria, discussed in more detail below. More importantly, Dr. Bernstein noted that while plaintiff was "quite tender" at two fibromyalgic points, he was also tender at "multiple other control areas" which the ALJ found suggestive of plaintiff being "less than forthright about self-certifying fibromyalgia pain to a physician." Tr. 34. Between Dr. Hill and Dr. Bernstein, the record supports the ALJ's determination that plaintiff's pain testimony is not believable in light of his atypical symptoms.

The ALJ also found plaintiff's testimony regarding the use of his cane to be inconsistent with his reports to Dr. Kalnins. The ALJ noted that during questioning, plaintiff acknowledged that no medical source had prescribed a cane for him and that he does not use it at all times. However, as the ALJ noted, this contradicts the impression he created for Dr. Kalnins who noted that plaintiff required a cane or scooter. Moreover, the ALJ remarked that plaintiff's use of a cane was unsupported by clinical evidence of an impairment that could reasonably be expected to product a limitation requiring an ambulatory assistive device. Indeed, Dr. Bernstein stated this directly.

The ALJ also found plaintiff unreliable because of plaintiff's "focus" on disability as evidenced, at least in part, by plaintiff's inquiry to Dr. Rice regarding medical marijuana. The ALJ found plaintiff's question to Dr. Rice significant because it evidenced a focus upon disability and a "familiarity with fibromyalgia as a method for pursuing benefit entitlement." Tr.

33 - FINDINGS & RECOMMENDATION

27.

When viewed together, all of these bases cited by the ALJ are specific, substantial, supported in the record, and satisfy the clear and convincing standard required to reject plaintiff's subjective testimony. The ALJ's conclusion that plaintiff's pain and functional limitations testimony was inconsistent with his self-described activities of daily living and was inconsistent with his failure to seriously adhere to a recommended exercise or medication regimen, is supported by the record. Additionally, his testimony is undermined by the fact that both Dr. Hill and Dr. Bernstein have related that his symptoms are atypical for fibromyalgia.

The ALJ's interpretation of other evidence as suggesting that plaintiff was not believable is a reasonable interpretation of the evidence. The fact that plaintiff gave Dr. Kalnins reason to believe that he required a cane shows his embellishment of symptoms and is inconsistent with the medical evidence demonstrating no clinical need for an assistive device.

"Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002). The ALJ's interpretation of the evidence relevant to plaintiff's credibility is not unreasonable. While a different factfinder may have reached a different conclusion, because the ALJ's determination is supported by the record, and the bases he cites are specific and substantial, the ALJ's conclusion is upheld.

Moreover, the fact that any of the other bases cited by the ALJ for rejecting plaintiff's subjective testimony may not have

34 - FINDINGS & RECOMMENDATION

support in the record, does not warrant a reversal of the ALJ's negative credibility finding when the ALJ's determination is otherwise supported. E.g., Batson, 359 F.3d at 1197 (error by ALJ was harmless and did not negate the validity of the ALJ's ultimate conclusion that the plaintiff's testimony was not credible).

II.  Treating Physician and Treating/Examining Rheumatologist

The ALJ rejected Dr. Rice's and Dr. Hudson's diagnostic and functional limitation opinions. Dr. Rice was clearly plaintiff's treating physician. Dr. Hudson is either a treating or examining practitioner. Although Dr. Hudson saw plaintiff only twice, because he actually treated plaintiff, he should be viewed as a treating source. See 20 C.F.R. § 1502 (treating source is your own physician who has provided you with medical treatment or evaluation and has ongoing treatment relationship with you); Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995) (treating sources are those who actually treat the claimant); Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989) (treating source is one employed to cure). Because, however, Dr. Hudson did not have a long, ongoing relationship with plaintiff, his opinion could be entitled to less weight than other treating sources. 20 C.F.R § 404.1527(d)(2)(I), (ii) (nature and length of treatment relationship effect weight given to source's opinion). Alternatively, even if Dr. Hudson is viewed as an examining source, the standards used to reject the uncontradicted opinion of an examining source are the same as those used to reject the opinion of a treating source. Lester, 81 F.3d at 830. Thus, in this case, the distinction is irrelevant.

A.  Standards

If a treating physician's medical opinion is supported by

35 - FINDINGS & RECOMMENDATION

medically acceptable diagnostic techniques and is not inconsistent with other substantial evidence in the record, the treating physician's opinion is given controlling weight. <u>Holohan v. Massanari</u>, 246 F.3d 1195, 1201 (9th Cir. 2001); 20 C.F.R. § 404.1527(d)(2); Social Security Ruling (SSR) 96-2p. An ALJ may reject the uncontradicted medical opinion of a treating or examining physician only for "clear and convincing" reasons supported by substantial evidence in the record. <u>Id.</u>; <u>Lester</u>, 81 F.3d at 830. The same standards are used in regard to a treating or examining source's opinion on the ultimate issue of disability. <u>Lester</u>, 81 F.3d at 830.

B. Discussion

Although the ALJ cites several reasons in support of his rejection of Dr. Rice's and Dr. Hudson's opinions, the fundamental flaw the ALJ found was the failure of these physicians to independently corroborate the diagnosis of fibromyalgia first noted by Dr. Hill. The ALJ correctly states that on November 24, 1998, Dr. Hill indicated that plaintiff had "borderline fibromyalgia." The ALJ suggests that Dr. Hill's diagnosis was in error because there was a failure of clinical findings to support it. I agree with the ALJ that Dr. Hill's own chart notes state that plaintiff did not meet all the diagnostic criteria for the disease. But, it is important to note that Dr. Hill's diagnosis was for "borderline" fibromyalgia and was not a conclusive diagnosis that plaintiff actually suffered from the condition. Nonetheless, the relevant point made by the ALJ is substantiated in the record - to the extent Dr. Hill's diagnosis suggests that plaintiff had fibromyalgia in November 1998, there are insufficient clinical

36 - FINDINGS & RECOMMENDATION

findings in support of such a determination.

The ALJ then concluded that Dr. Hill's flawed diagnosis provided the basis for Dr. Rice's and Dr. Hudson's diagnoses in the following months. As the ALJ explained,

> [s]ubsequent medical records indicate that the diagnosis of fibromyalgia in 1998, was adopted by other physicians and propagated throughout medical chart notes absent adequate documentation of the clinical criteria necessary to objectively establish the condition and seemingly without question as the credibility of the subjective allegations upon which the diagnosis relied.

Tr. 22.

To the extent the ALJ's opinion can be read to suggest that there is express evidence that Dr. Rice or Dr. Hudson actually relied on Dr. Hill's diagnosis, the ALJ is mistaken. Absent from the record are any comments in the chart notes of Dr. Rice or Dr. Hudson that, for example, either of them adopted Dr. Hill's November 1998 diagnosis.

Nonetheless, the ALJ correctly noted that neither Dr. Rice, nor Dr. Hudson adequately documented the clinical criteria necessary to objectively establish that plaintiff has fibromyalgia. As the Ninth Circuit has explained, fibromyalgia is diagnosed entirely on the basis of a patient's reports of pain and other symptoms. Benecke v. Barnhart, 379 F.3d 587, 590 (9th Cir. 2004). However, as the Ninth Circuit recognized, while there are no objective laboratory tests to confirm the diagnosis, the American College of Rheumatology issued a set of agreed-upon diagnostic criteria in 1990. Id.

The criteria, found on the American College of Rheumatology's

website[7] are (1) history of widespread pain; and (2) pain in eleven "tender point sites on digital palpation." www.rheumatology.org/publications/classification/fibromyalgia/ fibro.asp (1990 criteria for the classification of fibromyalgia). Both criteria must be satisfied.  Id.

Widespread pain is further defined as "pain in the left side of the body, pain in the right side of the body, pain above the waist, and pain below the waist."  Id.  In addition, "axial skeletal pain (cervical spine or anterior chest or thoracic spine or low back) must be present.  Id.  Shoulder and buttock pain is considered as pain for each involved site and low back pain is considered lower segment pain.  Id.  Widespread pain must have been present for at least three months.  Id.

As to the "tender point sites," the criteria note the specific bilateral sites at which to test for pain.  Id.  Digital palpation should be performed with an approximate force of four kilograms. Id.  Notably, "[f]or a tender point to be considered 'positive[,]' the subject must state that the palpation was painful.  'Tender' is not to be considered 'painful.'"  Id.

Dr. Rice diagnosed plaintiff with fibromyalgia in early January 1999, only about six weeks after Dr. Hill stated that plaintiff did not present with all of the diagnostic criteria for the condition.  Dr. Rice did perform his own physical examination of plaintiff and he noted that he found tenderness in the neck,

[7]  www.rheumatology.org/publications/classification/ fibromyalgia/fibro.asp (1990 criteria for the classification of fibromyalgia); www.rheumatology.org/publications/classification/ fibromyalgia/1990_criteria_for_Classification_Fibro.asp (entire report of multicenter criteria committee).

38 - FINDINGS & RECOMMENDATION

shoulder, and arms. Dr. Rice's chart note fails to show that his diagnosis is based on the appropriate classification criteria established by the American College of Rheumatology. He fails to adequately document widespread pain and fails to document the minimum number of painful "tender point sites" required for a proper diagnosis.

Dr. Rice saw plaintiff again on January 21, 1999, and noted knee and calf pain, as well as tenderness over the L-4, L-5, SIJ areas, the sciatic notch areas, and the posterior thigh. However, without more, these clinical findings are still inadequate to support the fibromyalgia diagnosis.

The same problem is seen in Dr. Hudson's April 1, 1999 chart note. There, Dr. Hudson also performed a physical examination of plaintiff. Although he found "multiple classic tender points identified in the shoulders, upper and lower back, hips, and elbows," this does not demonstrate that plaintiff had eleven of eighteen painful tender point sites. Again, the documentation of the required clinical criteria is absent.

Dr. Rice and Dr. Hudson each physically examined plaintiff on other occasions. Dr. Rice physically examined plaintiff again on July 7, 1999. At that time, Dr. Rice noted SIJ tenderness and some generalized tenderness into the hip and groin. Dr. Rice failed to note the presence of pain, as opposed to tenderness, and failed to document the presence of at least eleven tender point sites.

In April 2001, Dr. Rice noted that on examination, there was tenderness along the upper anterior chest near the sternum, over the posterior neck and trapezius muscles, over wrists and medial and lateral epicondyles on the elbows, on the knees and ankles, and

39 - FINDINGS & RECOMMENDATION

some over the SIJ areas.  Here, while the chart note can be read to suggest tenderness present at least at eleven sites, there is no documentation that they were painful as opposed to tender.

Dr. Hudson saw plaintiff again in September 2001.  At that time, Dr. Hudson simply recorded "multiple tender points documented as before."  Given that his initial recitation of multiple tender points in April 1999 was inadequate, the reference in September 2001 to the previous findings on physical examination is similarly inadequate.

The ALJ did not err in concluding that Dr. Rice's and Dr. Hudson's diagnoses are not supported by adequate documentation of the clinical criteria necessary to establish that plaintiff had fibromyalgia.

The ALJ also rejected Dr. Rice's and Dr. Hudson's opinions because they were based on plaintiff's subjective complaints which the ALJ determined were unreliable.  For the reasons discussed above, the ALJ's negative credibility determination is supported in the record and thus, this is a legitimate basis upon which to discount Dr. Rice's and Dr. Hudson's opinions.

Dr. Rice's and Dr. Hudson's functional limitation opinions suffer from the same defect.  In the November 12, 2001 questionnaire, Dr. Rice listed the following locations of tenderness as the positive clinical findings in support of his diagnosis:  trapezius, right and left elbow, right and left SIJ, right and left knee, and right and left ankle.  Tr. 220.  This equals nine tender point sites, not eleven, and makes the diagnosis based on a finding of "tenderness" as opposed to pain.

In his March 31, 2002 questionnaire, Dr. Hudson reported, in

40 - FINDINGS & RECOMMENDATION

response to a question that asked him to identify the positive clinical findings that demonstrated or supported his diagnosis, including location where applicable, that plaintiff had a classic history of pain, failure of medications, disrupted sleep, and multiple tender points in a classic distribution. Tr. 228. Even if his reference to "tender points" is equivalent to a finding of pain, this is inadequate documentation of the required criteria. Thus, the ALJ did not err in rejecting Dr. Rice's and Dr. Hudson's opinions.

As noted above, to be accorded controlling weight, the treating physician's medical opinion must be supported by medically acceptable diagnostic techniques. Holohan, 246 F.3d at 1201. While Dr. Rice and Dr. Hudson did perform independent physical examinations, their records do not adequately show the presence of the required clinical findings to support a diagnosis of fibromyalgia or functional limitations equivalent to total disability.

The reasons articulated by the ALJ for rejecting these physicians' opinions, namely that their opinions lack adequate clinical criteria documentation and were based on noncredible subjective testimony, are clear and convincing and are supported by substantial evidence in the record. As with the credibility determination, even if other bases alluded to by the ALJ in support of the rejection of Dr. Rice's and Dr. Hudson's opinions are not supported in the record, such error is harmless in light of the clear and convincing reasons which are supported by substantial evidence.

/ / /

41 - FINDINGS & RECOMMENDATION

III.  Mental Impairment

The ALJ accurately stated that although plaintiff initially claimed fibromyalgia as his sole basis for disability, he later added an allegation of depression as an additional basis.  Tr. 23. The ALJ evaluated plaintiff's allegations of depression pursuant to the provisions of SSR 96-3p and pursuant to the criteria of section 12.04 of Appendix 1, Subpart P, Regulation No. 4.  Tr. 23-24.  The ALJ concluded that upon consideration of the record in its entirety, the evidence failed to document persistent affective abnormalities or any other objective findings that demonstrate a medically determinable mental impairment that has imposed more than minimal work-related limitations upon plaintiff for any continuous twelve-month period relevant to this adjudication.  Tr. 23.  As a result, he found that plaintiff did not have a "severe" mental impairment.  Id.

First, the ALJ noted that the records of plaintiff's treating physicians documented infrequent references to depressive symptomatology and no evidence of any significant or persistent mental status abnormalities.  This is an accurate representation of the record.

The ALJ then remarked that plaintiff has never required emergency room intervention or psychiatric hospitalization for the treatment of depression.  Again, this is an accurate description of the evidence.

The ALJ recited that examining psychologist Dr. Prescott's evaluation in December 2000, reflected "benign mental status findings and no evidence of any significant impairment of affective functioning."  Tr. 23.  As detailed in the medical evidence section

42 - FINDINGS & RECOMMENDATION

above, Dr. Prescott found that plaintiff was fully oriented on mental status examination, his affect was within normal limits, his speech reflected logical reasoning processes, his intelligence was average as determined by proverb interpretation, and he demonstrated good memory and concentration. Tr. 154-55. He reported significant daily activities of caring for his dogs, mowing the lawn (although it took him two hours because of required rest breaks), burning trash, and performing some handyman chores. Tr. 153-54. He walked to and from his mailbox each day, a distance of several hundred yards. Id. He had recently taken a three-week vacation to England. Tr. 154.

Dr. Prescott noted self-reported symptoms of depression. She administered the Beck's Depression Inventory which revealed moderate depression. Id. Based on her interview and examination, the Beck Depression Inventory, and other tests designed to test concentration and short-term memory, Dr. Prescott diagnosed plaintiff as suffering from a dysthymic disorder. Tr. 155. She further assessed his Global Assessment of Functioning (GAF) score as 60. Id.

Dr. Prescott's opinion supports a conclusion that plaintiff's mental impairment is not severe. Her testing revealed only a moderate depression. The GAF score of 60 is on the border of mild to moderate impairment in functioning. Diagnostic & Statistical Manual of Mental Disorders 34 (4th ed., text revision, 2000). The ALJ's characterization of her evaluation as reflecting benign mental status and no evidence of significant impairment of affective functioning, is supported in the record.

The ALJ also noted that records from plaintiff's treatment

43 - FINDINGS & RECOMMENDATION

with Dennis in 2002 showed a good response to counseling and no evidence of any significant limitation of functioning due to depressive abnormality. Tr. 23. Dennis's notes show steady improvement in functioning and managing stress. Tr. 265-80. Plaintiff identified goals and remarked that treatment was helpful. Tr. 277. He began to fish which reduced his symptoms of depression. Tr. 276, 273. He reported continuing improvement in his relationship with his wife and noted that caring for animals helped him relax and sleep better at night. Tr. 271. In July 2002, plaintiff felt less depressed and Dennis was encouraged that he was looking at longstanding issues. Tr. 269. By August 2002, plaintiff was improving in his ability to regulate his emotions and reported continued improvement managing stress. Tr. 265, 267. Dennis's records support the ALJ's conclusion.

The ALJ further reasoned that plaintiff had engaged in significant activities of daily living during the period in which he alleges disability that are inconsistent with the existence of a severe affective disorder or any other medically determinable mental impairment. Tr. 23. Furthermore, the ALJ stated, plaintiff's subjective statements regarding his alleged work-related limitations due to a combination of mental and physical impairments should be accorded only limited credibility. Tr. 23-24. For the reasons discussed in the section on plaintiff's credibility, the record supports the ALJ's conclusions regarding plaintiff's activities of daily living and unreliable credibility.

Although the ALJ did not mention Dr. Kalnins's opinion in the section of his opinion finding plaintiff's mental impairment to be non-severe, he did discuss her evaluation in another part of his

44 - FINDINGS & RECOMMENDATION

opinion. Tr. 32-33. He concluded that her opinions of July 23, 2002, and August 29, 2002, were not supported by the weight of the evidence. Tr. 32.

He noted that Dr. Kalnins had failed to provide any information regarding the length of her clinical interview or whether she had administered any objective testing. Id. Rather, her evaluation is essentially a recitation of plaintiff's subjective allegations of disability due to life-long depression and fibromyalgia. Id. The ALJ criticized Dr. Kalnins for failing to summarize the content of some of plaintiff's statements to her so that the credibility of those statements could be assessed by comparing them to his other documentary reports and to his testimony. She also failed to identify the factual basis for her opinion that he showed no evidence of malingering or lack of cooperation with medical treatments and she failed to indicate that she had been provided with relevant copies of plaintiff's medical records. Id.

The ALJ concluded that while Dr. Kalnins alternately and inconsistently concluded that plaintiff had been totally and permanently disabled for two years (July 23, 2002 opinion), or four years (August 29, 2002 opinion), she "neglected to articulate a single objective finding of physical or mental status abnormality in support of those opinions that reflects an independent medical judgment derived from actual clinical observations and/or review of documentary medical evidence." Tr. 33. Furthermore, the ALJ stated, it is clear that Dr. Kalnins placed "unquestioning reliance" on plaintiff's subjective allegations regarding his medical history and functional limitations in arriving at her

45 - FINDINGS & RECOMMENDATION

opinions.  Id.

The record supports the ALJ's rejection of Dr. Kalnins's opinions.  Her reports reveal no review of plaintiff's medical records.  There is no discussion of the administration of any clinical testing and no mention of the length of the interview. Her assessment appears to be entirely based on plaintiff's self-reports which the ALJ found to be unreliable.

The ALJ did accept that plaintiff's history of depression caused mild difficulties in maintaining appropriate social functioning and mild difficulties maintaining concentration, persistence, and pace.  Tr. 24.  Given the substantial evidence in the record, the ALJ did not err in concluding that while plaintiff may have such mild limitations as a result of his depression, he failed to establish the existence of a severe mental impairment.

In summary, substantial evidence in the record supports the ALJ's negative credibility determination, rejection of Dr. Rice's and Dr. Hudson's opinions, and the finding of a non-severe mental impairment.  Accordingly, the ALJ did not err in concluding that plaintiff was not disabled.

CONCLUSION

The Commissioner's decision should be affirmed and a judgment dismissing this action should be entered.

SCHEDULING ORDER

The above Findings and Recommendation will be referred to a United States District Judge for review.  Objections, if any, are due March 14, 2005. If no objections are filed, review of the Findings and Recommendation will go under advisement on that date.

If objections are filed, a response to the objections is due

46 - FINDINGS & RECOMMENDATION

March 28, 2005, and the review of the Findings and Recommendation will go under advisement on that date.

IT IS SO ORDERED.

Dated this __25th__ day of __February__, 2005.


_/s/ Dennis James Hubel_
Dennis James Hubel
United States Magistrate Judge

47 - FINDINGS & RECOMMENDATION